# LOTHROP v. SPOKANE, P. & S. RY. CO.

## SAME v. OREGON–WASHINGTON R. & NAV. CO.

## SAME v. SOUTHERN PAC. CO.

(District Court, D. Oregon. January 4, 1926.)

Nos. 9413, 9414, 9444.

**1. Carriers ☞189—Tariff fixing rates must be strictly construed in accordance with printed language.**

Tariff fixing rates must be strictly construed in accordance with the printed language.

**2. Carriers ☞189—In determining rate chargeable, all parts of tariff filed should be considered.**

In determining rate chargeable, all parts of tariff filed should be considered, and, if plain meaning can be gathered therefrom, effect should be given to it, and tariff must be construed in its entirety, considering both limitations on its title page and rules contained therein.

**3. Carriers ☞189—Section of tariff applicable to goods shipped through to Hawaiian Islands, but having alternative operation with other sections held to apply.**

Where each section of tariff provided that lower rate in any other section should apply, though title of one section provided it should only apply to traffic consigned through to Hawaiian Islands, held, that such section had alternative operation with previous sections, where rates covered transportation to seaboard only.

**4. Carriers ☞189—Burden is with carriers to make and promulgate their rates and charges.**

Burden is with carriers to make and promulgate their rates and charges.

**5. Carriers ☞189—Rate fixed by traffic bureaus and organizations are construed liberally in favor of shipper in case of ambiguity.**

Traffic bureaus and organizations fixing rates for carriers act somewhat in legislative capacity to conserve their best interests, and rates, when presented to shipper and accepted, become a hard and fast contract, which is to be construed in case of ambiguity liberally in favor of shipper.

**6. Carriers ☞189—Amendatory matter of rate-fixing bureaus abrogated that which preceded if in derogation thereof.**

Amendatory matter of bureaus fixing rates, because of later publication, abrogated that which preceded, if in positive derogation thereof.

**7. Carriers ☞189—Shipper is entitled to most favorable construction of amendment of tariff.**

If amendment of carrier's tariffs creates an ambiguity only, shipper is entitled to that construction most favorable to him.

**8. Carriers ☞36—Counsel fees may be recovered for taking of unlawful rate or charge on lawful shipment of freight.**

Interstate Commerce Act, § 8 (Comp. St. § 8572), providing for recovery of counsel fees

10 F.(2d)—15

from carriers, held to cover damage caused by charging unlawful rate or charge on lawful shipment of freight.

**9. Costs ☞207—Court will allow attorney's fees as prayed, where no counter testimony is presented and reasonableness of claim was not questioned.**

Where plaintiff submitted testimony as to reasonableness of attorney's fees, and no counter testimony was presented, and defendants in neither arguments nor briefs questioned reasonableness of claim, court will allow attorney's fees as prayed.

**10. Carriers ☞189—"Rate" means proportional estimation according to some standard.**

In absence of evidence of custom or usage giving it a different meaning, "rate" held used in Interstate Commerce Act (Comp. St. § 8563 et seq.), and carrier's tariffs, in its common meaning as a proportional estimation according to some standard, and not in any peculiar sense, such as to deprive court of jurisdiction of action to recover overcharges.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Rate.]

**11. Carriers ☞189—"Prescribed rate" defined.**

In view of Comp. St. § 8569, prescribed rate may consist of variety of elements, such as character of the commodity to be transported, distance of carriage, privileges and facilities accorded, and rules and regulations accompanying tariff, or imposed by the commission and in order to find the rate all elements which produce it must be taken into account.

At Law. Actions by John H. Lothrop against the Spokane, Portland & Seattle Railway Company, against the Oregon-Washington Railroad & Navigation Company, and against the Southern Pacific Company. General finding for plaintiff rendered.

Wilson & Reilly, of Portland, Or., for plaintiff.

Carey & Kerr and Charles A. Hart, all of Portland, Or., for defendant Spokane, P. & S. Ry. Co.

A. C. Spencer, Arthur A. Murphy, and Thos. H. Maguire, all of Portland, Or., for defendant Oregon-Washington R. & Nav. Co.

Ben C. Dey and Alfred A. Hampson, both of Portland, Or., for defendant Southern Pac. Co.

WOLVERTON, District Judge. These are actions instituted for recovery of certain alleged overcharges on freight shipments, from Detroit and other allied points of shipment in the Middle West, under the westbound tariff, generally to Portland and East Portland, Or., but in some instances to other western termini, such as Bend, La Grande and Marshfield, Or., and Seattle and Walla

Walla, Wash. The shipments consisted of automobiles, and were domestic in character, that is, from inland to inland and seaboard points; nor were any of them destined to or consigned through to Hawaiian Islands. The carriers made their charges under section 2 of the tariff, and they were paid by the shippers. Section 4 of the tariff provides a lower rate, which the shippers claim is the lawful rate. The purpose of these actions is to recover back the difference between the charges under sections 2 and 4. The three causes were submitted to the court, without the intervention of a jury, and were tried together. Being of such close analogy, one opinion will suffice to dispose of all of them.

The crucial question involved here is one of law, and relates to an interpretation of the tariff as respects the rates applicable to the shipments concerning which it is alleged the carriers collected overcharges on freight transportation. The inquiry is really one confined to very narrow limits. The simple question is whether defendants were justified in making their charges in pursuance of the alternative application clause of section 2 of the tariff, or should they have made such charges in pursuance of the allied clause of section 4? A brief reference to the adoption of the alternative application clause pertaining to each of the four basic sections of the tariff will aid materially in arriving at the proper construction of the two alternative application clauses involved here, namely, those pertaining to the basis classifications 2 and 4.

Under West-Bound Tariff 4–Q rates are classified as class rates, commodity rates, and special commodity rates, and are denoted in the tariff as sections 1, 2, and 3. Each of these sections carries an alternative application clause, which precedes the specific rates prescribed. For clarity, I give them here. The clause pertaining to section 1 is as follows:

"If the rate in section 2 or section 3 of this tariff, makes a lower charge on any shipment than the rate in section 1 of this tariff, the rate in section 2 or section 3, whichever is lowest, will be applied. (See notes 1 and 2 below.)"

That pertaining to section 2:

"If the rate in section 1 or section 3 of this tariff makes a lower charge on any shipment than the rate in section 2, of this tariff, the rate in section 1 (see note 1, page 129), or section 3, whichever is lowest, will be applied)."

And that to section 3:

"If the rate in section 1 or section 2 of this tariff makes a lower charge on any shipment than the rate in section 3 of this tariff, the rate in section 1 (see note 1, page 129) or section 2, whichever is lowest, will be applied."

The purpose of these alternative application clauses is obvious. It is to afford the shipper the lowest freight charge where the shipment is essentially the same as respects distance of carriage and transportation or from and to points in same zones, recognized by the tariff.

By supplement No. 34 to West-Bound Tariff No. 4–Q, effective June 1, 1922, there was constituted by the Transcontinental Freight Bureau an additional section 4, denominated "Export Rates to Pacific Coast Ports, Applying Only on Traffic Destined to and Consigned through to Hawaiian Islands." There was adopted at the same time the following alternative clause:

"If the rate in section 1, section 2, or section 3 of this tariff makes a lower charge on any shipment than the rate in section 4 of this tariff, the rate in section 1 (see note 1, page 129, of tariff, and as amended), section 2, or section 3, whichever is lowest, will be applied."

This gave the shippers under the added section 4 the advantage of the lowest charge to be found in sections 1, 2, and 3; but shippers under none of these last sections were accorded the alternative privilege of the charge under section 4, if that should be the lowest.

Later West-Bound Tariff No. 4–R was adopted, effective July 1, 1922, with the caption, as it respects section 4, "Export Rates to Pacific Coast Ports on Traffic Destined to and Consigned through to Hawaiian Islands." The same alternative clause in effect was also adopted. The wording is slightly different, but the meaning is the same in so far as it relates to the present controversy. By the same tariff, the alternative application clauses of sections 1, 2, and 3 were also amended, so as to include section 4 therein; the amendment as respects section 2 reading as follows:

"If the rate in section 1, section 3, or section 4 of this tariff makes a lower charge on any shipment than the rate in section 2 of this tariff, the rate in section 1 (see note 1, page 153), section 3, or section 4, whichever is lowest, will be applied."

Thus by the amendment of these alternative application clauses appertaining to

sections 1 to 3, inclusive, the alternative application clauses of all four sections were made to harmonize, which apparently gave the shipper the advantage of the lowest charge under any section. This, of course, applies to shipments where the transportation is over lines extending from and to points designated in the tariff, as, for instance, those shown on page 47 of Supplement No. 34 and page 454 of West-Bound Tariff No. 4-R.

Later there was published Supplement No. 20 to Tariff No. 4-S, effective October 1, 1923. This tariff added a new section 5, "Import Commodity Rates," with an alternative application clause making such section alternate with the four preceding sections, and the alternative application clause of each of the preceding sections was so amended as to make section 5 alternate therewith. By Supplement No. 24, Supplemental to Tariff 4-S, effective November 1, 1923, the alternative application clauses appertaining to sections 1, 2, and 3 were amended by eliminating therefrom sections 4 and 5.

Thus stands the record. All the matters forming the bases of these actions had their origin subsequent to the date when Tariff 4-R became effective, namely, July 1, 1922, and prior to and exclusive of November 1, 1923, when Supplement No. 24 to Tariff 4-S became operative. It may be noted that, as to the rates or charges on automobiles, as respects the transportation complained of, by comparison of section 2 with section 4, having in view the alternative application clause appertaining to each, those of section 4 are the lower, and this denotes the grievance of which complaint is made.

We come, now, to a construction of the alternative application clauses pertaining to sections 2 and 4, for determining whether plaintiff is entitled to the application of the rate basis of section 4. It may be premised, in so far as the shipments in litigation are concerned, that the points of origin and of destination are practically the same, whether section 2 or section 4 be considered. In other words, like and similar routes of traffic, with analogous originating and terminal points, are embraced by sections 2 and 4. Neither section comprises terminal points beyond the Pacific seaboard of the United States, or within the Hawaiian Islands. In fact, the Interstate Commerce Commission does not assume to regulate rates of traffic extending to the Hawaiian Islands. So that all rates of traffic under the West-Bound Tariff extending to the Pacific Coast terminate there, and do not extend beyond.

[1, 2] It is a canon of interpretation applicable that the tariff must be strictly construed in accordance with the printed language. Caddo Central Oil & Ref. Corp. v. Director General, 92 Interst. Com. Com'n R. 627, 632. It is another canon of construction that, in determining the rate to be charged by a carrier, all parts of the tariff filed should be considered, and, if a plain meaning can be gathered therefrom, effect should be given to it, and, further, the tariff must be construed in its entirety, considering both the limitations on its title page and the rules contained therein. Portland Cattle Loan Co. v. Oregon Short Line R. Co., 251 F. 33, 163 C. C. A. 283; United Shoe Machinery Corp. v. Director General, 55 Interst. Com. Com'n R. 253.

We have the fact that under Tariff No. 4-R the alternative application clauses, as heretofore indicated, attend respectively sections 2 and 4. Section 2 is made to alternate with section 4, and, conversely, to be applied, depending upon which is the lower. Without else, depending upon the mere reading of these clauses, the meaning is plain and unambiguous, and, if the charge in section 4 were the lower, it would very naturally be applied. But there is the title of section 4, and explanatory headnotes designed apparently to indicate the particular traffic upon which the rates and charges shall be applied, which should be considered along with the reading of the alternative application clauses. When adopted, section 4 was entitled "Export Rates to Pacific Coast Ports," with an explanatory paragraph, "Applying only on traffic destined to and consigned through to Hawaiian Islands." When the section was carried into West-Bound Tariff No. 4-R, effective July 1, 1922, the title was remodeled to read, "Export Rates to Pacific Coast Ports on Traffic Destined to and Consigned through to Hawaiian Islands." We find also, at the top of each subsequent page, where the charges and routings are shown, this legend: "Export Rates to Pacific Coast Ports. Applying only on traffic destined to and consigned through to Hawaiian Islands." These title designations and explanatory headings must be given a meaning, along with the wording and language of the alternative clauses, and harmony established, if possible. This language is also plain, and within itself its meaning would seem to be indisputable. But, read in relation to the alternative application clause appertaining to section 2, there is presented at least an apparent, if not an insuperable, ambiguity.

[3] It is patent, however, that, after having used this very specific and definite language, the Bureau later deliberately adopted the alternative application clause defining the application of rates and charges respecting section 2. This is true—that the transportation relates to Pacific Coast shipments; that is, to the seaboard. The charges carried by the traffic are to the seaboard, and not beyond. The routing, including points of origin and discharge, on traffic covered by section 4 and section 2, is analogous, and a case is presented where alternative charges may very well be applied. They were in fact declared to be applicable by the adoption of the alternative clauses. Whether the Bureau by mischance or misadventure made the declaration is not for us to inquire. The question is: What is the effect and intendment of its legislation?

The reasonable thought is that, notwithstanding the Bureau was dealing with what was styled export traffic, it concluded—the transportation being only to the seaboard and the routing and points of origin and discharge being analogous—that the shipper was entitled to the benefits to be derived from alternative application of charges, whichever was the lowest, as between sections 2 and 4. No rates, it may be repeated, were prescribed beyond the Pacific seaboard. The Bureau had no power to prescribe such charges; nor had the Interstate Commerce Commission any power to approve. The only fair and reasonable construction of the intendment of the tariff, notwithstanding the apt language of the title and explanatory headlines appertaining to section 4 to the contrary, is and was that section 4 has alternative operation with section 2, and vice versa, respecting rates and charges; those applicable being the lower.

[4, 5] Under the theory and practice of rate-making, the burden is with the carriers to make and promulgate their rates and charges. It results that the rates adopted are multitudinous, covering a vast variety of commodities, including the elements of routing and distance of haul. In order to render the rates and charges as made intelligible, adaptable, and practical, it was essential that they be systematized, classified, and so arranged that the shipper could readily and intelligently ascertain and determine what was offered in the way of transportation and the charges attending the same. To meet this exigency, traffic bureaus and organizations have sprung up, and have published tariff regulations, including the rates and charges respecting commodities listed.

Among these we have the Transcontinental Freight Bureau, which has devised, digested, assimilated, and arranged the West-Bound Tariff. The bureaus have supplied a multitude of rules and regulations, explanatory notes and paragraphs, not primarily suggested by the carriers in making their rates. While representing the carriers, they act more or less in a legislative capacity, to conserve their best interests. At any rate, the aggregation and classification of rates, when presented to the shipper, embody a proposition for carriage, and, when accepted, become a hard and fast contract, which is to be construed in case of ambiguity more liberally in favor of the shipper. Sutherland Flour Mills Co. v. Director General, 81 Interst. Com. Com'n R. 365, 366; Northwest Steel Co. v. Director General, 68 Interst. Com. Com'n R. 195, 198; Pacific Rice Mills v. Director General, 78 Interst. Com. Com'n R. 459, 461.

[6, 7] Now, whether the acts of the Bureau, acting in behalf of the carriers, be considered legislative or contractual, amendatory matter, because of later publication, must be held to have abrogated that which preceded, if in positive derogation thereof. If it creates an ambiguity only, the shipper is entitled to that construction most favorable to him. The shipper has no hand nor part in rate-making, or the regulations governing its application or supposed interpretation. In 92 Interst. Com. Com'n R., supra (at page 631), the Commission uses this language:

"By publishing this charge in identical language in two items diametrically opposed to each other in their application, defendant was responsible for tariff provisions which were ambiguous and contradictory, and provisions of that character must be construed in favor of the shipper."

So that, upon the whole, plaintiff is entitled to a recovery of the excess charges sued for.

Plaintiff sues for attorney's fees and interest also. The question is presented whether plaintiff is entitled to attorney's fees; the actions being for recovery of overcharge, and not, as counsel say, for damages.

[8] Section 8 of the Interstate Commerce Act (3 Fed. Stat. Ann. p. 833 [Comp. St. § 8572]), provides that, if any common carrier shall do or cause to be done any act, matter, or thing in this act prohibited or declared to be unlawful, such carrier shall be liable to the person or persons injured for the full amount of damages sustained, together with reasonable counsel fees, to be fixed by the court in case of recovery. If a

carrier takes from the shipper an unlawful rate or charge on a lawful shipment of freight, it is hardly conceivable that the shipper is not damaged by the act, and it would seem that the intendment of the act is to cover this kind of damage along with the rest. So attorney's fees would follow. Whether called reparation or damage is of no moment. It results from an injury inflicted, and comes within the purview of section 8. Mills v. Lehigh Valley R. R., 238 U. S. 473, 481, 35 S. Ct. 888, 59 L. Ed. 1414.

[9] Testimony was submitted on the part of plaintiff relative to the reasonableness of the attorney's fees prayed for. No counter testimony was presented, and defendants in neither their arguments nor briefs have questioned that the claim is reasonable if plaintiff is entitled to recover at all. The court, therefore, will allow the attorney's fees as prayed. An objection was interposed to the admission of the testimony on this subject, and the ruling thereon was reserved. The objection is now overruled.

The court will also allow interest on the demands at 6 per cent. from November 1, 1923.

[10] Testimony has been offered in the Oregon-Washington R. R. Case, with a view to determining whether the term "rate" is used and employed in the Act to Regulate Commerce (Comp. St. § 8563 et seq.) and the West-Bound Tariff in its ordinary and common sense and acceptation, or in a peculiar sense impressed thereon by usage and custom different from its common acceptation. This presents a question going to the jurisdiction of this court to entertain the cause of action. The common meaning of the word "rate," as it may have application here, is a "proportional estimation according to some standard." Century Dict. and Cyc. Section 8569, Comp. St., provides, among other things, that every common carrier shall file with the Commission a schedule of rates, fares and charges for transportation between different points on its own route, and between points on its own route and points on the route of any other carrier by railroad, when a through rate and joint rate have been established. Then it is required that the printed schedule shall plainly state the places between which property will be carried, and shall contain the classification of freight in force and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the shipper or consignee.

[11] It is apparent from these regulations and the testimony adduced that a prescribed rate may consist of a variety of elements, such as the character of the commodity to be transported, the distance of carriage, the privileges and facilities accorded, and the rules and regulations accompanying the tariff, or that may be imposed by the Commission, and the like. In order to find the rate, all the elements which produce it must be taken into account. But that a rate consists of two or more or several elements does not of itself impart to it any peculiar meaning, or any less or more than its ordinary significance would imply. Nor does the fact that the rate is subject to an alternative regulation respecting application impart to it peculiar meaning, or any other than the ordinary one. The evidence fails utterly to show anything from which it may be deduced that any custom or usage exists whereby any different meaning should be accorded the term than that of its usual acceptation. The standard is fixed by the provisions of the tariff, and the proportional estimations of the rate may be intelligently appraised according thereto. The only question involved here is one of construction. Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943. The contention of counsel that the word "rate," as used in the tariff, bears a peculiar meaning, must therefore be resolved in the negative.

The court will render a general finding in each of these cases. The parties may, if they see fit or desire, tender special findings within 20 days from the date the decision is handed down, and, when tendered, the court will rule upon them.